[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a limited contested dissolution case wherein the plaintiff husband seeks a dissolution of marriage and a division of the marital assets. In determining its orders the Court is cognizant of and gives consideration to the requirements of Connecticut General Statutes Section 46b-81(c).
The parties were intermarried on September 11, 1965 in Somersville, Connecticut and have resided continuously within this state for at least twelve months next preceding the filing of the complaint. There was one child born issue of the marriage, namely Clarissa Lucia, who is now twenty-six years of age.
Based on the testimony presented at trial, the Court finds that the marriage has broken down irretrievably and orders that it be dissolved on said grounds.
The biggest point of contention is the assignment of the parties jointly owned residence known as 112 Ridge Road in the town of Chaplin, Connecticut. The plaintiff husband requests that the equity in the home, which exceeds $100,000.00, be split fifty-fifty while the defendant wife requests an assignment of the property to her without any payment to the husband. She bases her request primarily on claims that her husband caused the breakdown of the marriage, that he has a better opportunity to acquire future assets and income, and that she or her family contributed more to the acquisition of this asset.
As an aside, after hearing the evidence in this case with its bitter recriminations and explicit testimony concerning the parties most intimate relationships, the value of the intensive pre-trial settlement program available through our Family Special Master procedure cannot be overstated. Although it was not successful in this case, in those cases where it is, the animosity, pain and hostility which make future interaction between the parties resulting from a contested trial so very difficult, are greatly CT Page 8595 alleviated. Those who do benefit from the program are, in this writer's opinion, well served indeed.
At the time of the marriage the husband was twenty-three years old and the wife was twenty-one. He was in the Air Force stationed at a base on Cape Cod. They bought a trailer home with borrowed money and lived in Truro, Massachusetts for about one year when they moved the trailer to a trailer park in Connecticut. In 1966 their daughter, Clarissa was born. After he was discharged from the service Mr. Lucia returned to Connecticut and with the aid of the "G.I. Bill" enrolled in college eventually earning an Associate's degree in engineering. Mrs. Lucia worked as well and by 1978 they were able to save enough money to buy a house lot in Chaplin. They arranged to have their home built on the lot by a student class from Windham Tech. Beside the construction mortgage some money was borrowed from family members and those private family loans were paid back. Those parts of the house which were not built by the students were, for the most part, done by Mr. Lucia, with help from his wife, their daughter and members of Mrs. Lucia's family. In short, it was a family project.
By 1986 the marriage was in trouble and in that year Mrs. Lucia started dating a co-worker. In June 1988 she moved into a home owned by the co-worker with whom she had formed a close relationship. Since June 1988 Mrs. Lucia has continued to live with her co-worker companion in his house. Mr. Lucia continued to live in the family home and has paid the mortgage, taxes, insurance and maintenance on the property since 1986. Their daughter, Clarissa, who was almost twenty years old in the summer of 1986, continued to live in the family home with her father, without paying room and board, until 1992 when she moved into an apartment of her own.
In July 1986, Mr. Lucia commenced a dissolution action and although there was no reconciliation and Mrs. Lucia continued to live with her co-worker, the dissolution action was withdrawn in May 1988.
This living arrangement continued on until 1991 when Mr. Lucia began dating another woman. In October 1992 Mr. Lucia's companion, Carol, moved into the Lucia home. This development was not accepted graciously by either the daughter Clarissa or by Mrs. Lucia. Mrs. Lucia telephoned her husband and told him to get rid of the woman or lose the house. Carol, however, did not leave and a short while later Mrs. Lucia returned to the family home with a CT Page 8596 suitcase and announced that she was moving back. After four days Carol found the situation too awkward and uncomfortable and she moved out.
Subsequently both parties filed motions for exclusive possession of the property and this Court granted Mr. Lucia exclusive possession. At the present time Mrs. Lucia is back living with her companion, Clarissa has her own apartment and Mr. Lucia is living in the family home with Carol and his elderly mother.
In support of her claim that she is entitled to an assignment of her husband's interest in the home, Mrs. Lucia claims that she is the victim of his mental and physical abuse. Mr. Lucia denies, for the most part, any such charges. In addition to her own testimony Mrs. Lucia presented the testimony of Evan Stark, PHD. Dr. Stark was qualified as an expert in the area of family violence including battered woman's syndrome. He concluded, based on two interviews with Mrs. Lucia, that she exhibits the symptoms or patterns of an abused woman which include low self-esteem, frequent weeping, self-blame, difficulty in expressing herself and difficulty in establishing new relationships, especially with other men. He also concluded that Mrs. Lucia's personality was formed, in large part, by her upbringing where she was taught that she was inferior and that she was expected to be subservient to her husband. Dr. Stark specifically mentioned the following factors as being the underpinnings for his conclusions:
1. Manipulation — Dr. Stark concluded that Mr. Lucia manipulated events in order to exercise control and dominance over his wife. As an example Dr. Stark stated that Mrs. Lucia was put on an allowance by her husband. The evidence, however, was that Mr. Lucia turned his pay check over to his wife and that she handled the family finances. There did come a time years later when Mr. Lucia felt he was not being given enough money for his weekly needs. At that point he started to withhold $100.00 weekly for his expenses. Mrs. Lucia countered by opening a bank account in her name into which she deposited $100.00 per week. Further, Mrs. Lucia herself testified that Mr. Lucia did not try to control her by controlling the family finances. The evidence as to manipulation is not at all conclusive.
2. Mental Abuse — There were periods of time when Mr. Lucia became uncommunicative and one period was particularly extended, even lasting longer than one year. Dr. Stark views such behavior CT Page 8597 as an attempt to exert control, although he conceded that Mr. Lucia's perception could be different than Mrs. Lucia's and he might not even understand that such behavior was abusive. While acknowledging that he was guilty of such behavior, Mr. Lucia attributes it to periods of depression. Yet even during the uncommunicative times (whether due to depression or hostility), there was some interaction between the parties. They attended family functions together, bought furniture together, picked out suits for Mr. Lucia, to name some instances.
3. Physical Abuse — There were occasions when confrontations between the parties became physical. There was an instance when Mr. Lucia grabbed Mrs. Lucia by the neck and shoved her and an instance when Mrs. Lucia threw a cup of tea into Mr. Lucia's face. Probably the worst episode occurred when Mr. Lucia suspected that his wife was having an affair with her co-worker. After some self-help detective work, he confronted her, they argued and he shoved her into a wall causing her to fall down. There may or may not have been one or two other such incidents but they were sporadic if they took place. The police were never called, there was no medical treatment and no evidence of bruising or injury. (Even so, one incident like this is one too many)
Mrs. Lucia also claims that her husband frequently had forced sexual relations with her, a claim which he adamantly denies. This allegation was not raised by Mrs. Lucia at any time during the prior dissolution action which remained open for approximately two years. Without going into the details of the conflicting evidence presented by the parties, the Court is not satisfied that the burden of proof has been met as to this allegation.
Further, with respect to the matter of abuse, Dr. Stark stated that in the majority of abusive relationships, the abusive behavior usually ceases when the parties separate, especially if the batterer enters into a new relationship as he would then be likely to direct his abusive behavior toward the person with whom he is more recently involved. In this case the husband began dating another woman in 1991, some five years after Mrs. Lucia left him. He has been living with his new companion since August 1992. She is an intelligent articulate woman who testified, in contradiction to Dr. Stark's hypothesis, that Mr. Lucia has never been abusive to her in any way. While the Court is not going to brand Mr. Lucia with the pejorative label of a wife batterer, with all the negative implications that term implies, this is not to say that he was without fault in causing this marriage to fail. Mrs. Lucia was, CT Page 8598 and probably still is, an emotionally fragile woman. For a period of ten years during the marriage she was on the prescription drug Librium and for a short period was taking the more powerful drug Thorazine. She sought counseling but Mr. Lucia refused to see her counselor for joint therapy, even on a trial basis. In fact, when Mrs. Lucia was asked what, in her opinion caused the breakdown of the marriage, she responded that it was probably Mr. Lucia's refusal to participate in counseling. He appears to have put too little effort in trying to understand the needs and problems his wife was having. He focused on his own concerns complaining that Mrs. Lucia made sarcastically demeaning comments to him and was uncompromising in her positions. Although he was subject to periods of depression, he was stronger emotionally than she and could have been more supportive than he was.
The result of this disharmony in the relationship was that the marriage was generally unhappy with each party feeling he or she was being treated unfairly by the other. Ultimately Mrs. Lucia resolved the turmoil when she found someone with whom she could have a happier life. Mr. Lucia subsequently was able to do the same.
Both parties are at or close to the top of their earning abilities without advanced degrees. As noted Mr. Lucia has an Associate's degree and works as an electronic technician at the United Technologies Research Center in East Hartford. He grosses about $38,500.00 per year. Mrs. Lucia is a grants administrator at the University of Connecticut. Her gross annual salary is approximately $47,800.00. In 1986 when the parties separated Mrs. Lucia was also earning more than her husband.
Both have vested retirement accounts thus have reasonable security for the future.
Since 1986, Mrs. Lucia was able to accumulate substantially more in liquid assets. At one point she had $48,000.00 in savings on her own. Her savings account has been depleted somewhat from the high of $48,000.00. Some was spent on graduate school tuition for Clarissa, auto repairs and other things which have reduced her savings to $26,000.00. Mr. Lucia's assets are more modest. He has approximately $1,000.00 in savings.
When Mrs. Lucia left in 1986, there were liquid marital funds of approximately $3,000.00 consisting of a bank account and an IRS refund, which Mr. Lucia was able to use for his needs. CT Page 8599
The current value of the jointly held real estate is $145,000.00. When Mrs. Lucia moved there was a mortgage balance of $35,760.00. She has not contributed to any mortgage reduction since that time. The equity to be divided is $109,240.00.
Both parties, in their proposed orders, seek to obtain title to the house. Mrs. Lucia's request to have the house conveyed to her without payment to Mr. Lucia would be unjust and inequitable. Mr. Lucia has indicated his willingness and ability to refinance the home and proposes to pay his wife fifty percent of the equity.
Considering the requests of the parties in light of all the circumstances discussed herein, the Court orders as follows:
The plaintiff husband shall have the first option of purchasing the defendant wife's right, title and interest in the jointly owned property located on Ridge Road in the town of Chaplin upon payment to her of $61,582.00 within eighty days. This sum reflects 55% of the equity plus one half of the joint funds of the parties when Mrs. Lucia left. The defendant shall cooperate in executing any documentation necessary to effectuate the refinancing of the mortgage in Mr. Lucia's name.
If Mr. Lucia is unwilling or unable to exercise his option to buy, Mrs. Lucia shall have the second option of purchasing his right, title and interest in said property upon payment to him of $47,658.00 within eighty days after the expiration of the plaintiff's option period or notification to the defendant that Mr. Lucia will not exercise his option, whichever is sooner. This sum reflects forty-five percent of the equity minus one half of the joint funds of the parties at the time of separation. The plaintiff shall cooperate in executing any documentation necessary to effectuate the refinancing of the mortgage in Mrs. Lucia's name in the event the secondary option comes into play.
Either party may request an extension of their respective option period for cause.
If neither party exercises their option to buy, then the property shall be sold by listing it with a real estate broker agreed upon by the parties. The net proceeds after the expenses of the sale, shall be divided with fifty-five% plus $1,500.00 to the defendant wife and the balance to Mr. Lucia. CT Page 8600
Mr. Lucia shall be responsible for taxes, insurance and maintenance until the time of sale.
Alimony is not awarded to either party.
Each party shall be entitled to sole possession of their individual retirement accounts.
Each party shall be liable for the debts reflected in their financial affidavits.
Each party shall be responsible for their own counsel fees.
The plaintiff shall return the following items of personal property to the defendant:
Floor Clock Several unmatched oak chairs
Antique Chest of Drawers Bedroom set — Bed and 2 dressers
Set of six antique oak chairs Dining Room Table
Antique oak library table One sofa
Antique oak drop front desk Patio furniture
Antique oval wicker table Record albums
Antique wooden tool chest
Several antique trunks
Antique oak arm chair
Antique oak bed headboard
The defendant shall give the plaintiff reasonable notice to pick up said personal property.
BY THE COURT,
Lawrence C. Klaczak Judge, Superior Court CT Page 8601